[No. 1931-2. Division Two. June 28, 1976.]

THE STATE OF WASHINGTON, *Appellant*, v. GERALD ALLEN AGEE, ET AL, *Respondents*.

*James E. Carty, Prosecuting Attorney*, and *Thomas C. Duffy, Deputy*, for appellant.

*Art Curtis* of *Clark County Legal Services,* for respondents.

REED, J.—This is an appeal by the State of Washington from orders of the Clark County Superior Court suppressing certain evidence and dismissing possession of LSD charges against the defendants, Gerald Allen Agee and Richard Franklin Chulufas. We reverse and remand for trial.

Victor Llorens was well known to Sergeant Victor Calzaretta, Deputies Larrabee and Buller, and other members of the Clark County Sheriff's office, having provided them with information leading to undercover drug purchases, a number of felony arrests for drug violations, recovery of several stolen vehicles, and the solution of 34 burglaries. Much of this information had been provided within a matter of weeks before the incident in question. On occasion Llorens was paid for his information and the sheriff's office considered him very reliable. Defendant Agee was also known to the sheriff's office as one involved with illegal drugs.

It was, therefore, not unusual that Sergeant Calzaretta acted immediately when, at 12:30 p.m., June 19, 1975, Llorens told him by phone that Agee and another man, unknown to him, would be arriving at Llorens' location in 30 to 40 minutes to deliver LSD in the form of "purple microdots." He recounted to Calzaretta how the stranger had offered to sell the illegal substance and agreed to return after giving Llorens 1 hour to secure the necessary funds. Llorens urged the officer to send someone in a hurry. The sergeant contacted Deputy Larrabee and related the story to him, at the same time vouching for his informant's credibility. Neither officer made any inquiry of Llorens as to his right to be present at the residence address he gave of 6605 Northeast 135th Avenue, Vancouver, Washington. Based upon this information and the fact it would take approximately 20 minutes, or 10 minutes using emergency equipment, to travel from the courthouse to the address given,

the officers made no attempt to procure a warrant of any kind. Although it was noontime, one of the four district court judges or one of the four superior court judges might then have been available in the courthouse.

Deputies Larrabee and Buller hurried to the residence, arriving a little before 2 p.m., and were invited in by Llorens, who then repeated his story, adding he had used the name "Wayne" with defendant Chulufas because Agee, who had not left the car, would know Llorens on sight or by name, as an informer. The officers evolved a plan to secrete themselves in the bedroom and observe the actual drug transaction, agreeing to take Llorens with them after the arrest. They later observed him packing a suitcase with his personal belongings. Llorens indicated he had been "staying there" in the residence which belonged to "some girl." Also present in the residence was a Todd Hamann, who wanted no part of "busting" Agee, and who thereupon hid himself under a bed where he remained throughout the denouement. The officers' plan went awry, however, when both Agee and Chulufas approached the door, so it was decided Llorens would leave the room and Officer Buller, who was also known to Agee, would station himself behind the door which was to be opened by Deputy Larrabee.

Deputy Larrabee opened the door to the defendants and defendant Chulufas asked for "Wayne" and both defendants entered when the officer indicated "Wayne" was there. Deputy Buller then closed the door, at which point Agee said to him, "You got me good this time." Each defendant was placed under arrest, searched, and found to have in his possession a bottle of purple tablets which Larrabee identified as LSD, "purple microdots" as previously described by Llorens. Defendants were each charged with one count of possession of LSD.

At the hearing on defendants' motion to suppress, it developed that Llorens had been staying at the home with permission of its two young girl occupants, but had been asked to move the night before, and appeared to have done so early that morning. The occupants, believing he had

moved out, had locked the house and testified Llorens had no permission to reenter later that day. The trial judge thereupon granted the defendants' motion to suppress the evidence seized from defendants and dismissed the charges with prejudice, both sides having stipulated the evidence was indispensable to proof of guilt.

The State appeals and the parties frame the following issues: (1) must findings of fact and conclusions of law be entered upon a suppression hearing and error assigned thereto in order to secure appellate review; (2) was the search of defendants unlawful because the officers did not procure a search warrant; (3) was the search of defendants unlawful because Llorens was not questioned as to his right to be in the residence and was in fact a trespasser therein? We answer all these questions in the negative and reverse and remand for trial.

The State's assignments of error are directed solely to certain conclusions of law entered by the court, and we are met at the outset with defendants' claim the trial court's findings of fact must be accepted as verities, no error being assigned thereto. CAROA 42(g)(1)(iii); CAROA 43. We do not agree, as there is no requirement for entry of formal findings of fact and conclusions of law in suppression hearings. Such a proceeding is not an action "tried upon the facts," CR 52(a)(1); RCW 4.44.050; nor are such findings required by "statute, by another rule, or by a local rule of the superior court." CR 52(a)(2)(C); RCW 4.44.050. Neither are they necessary to decisions on motions, CR 52(a)(5)(B). Motions to suppress are now governed by CrR 4.5, which makes no provision for such findings. If our Supreme Court had intended they be required, it would have specifically provided for them as it did in "voluntariness" hearings under CrR 3.5. Not being required by statute or rule, they are surplusage in this case and without prejudice to the state. *Sinclair v. Betlach*, 1 Wn. App. 1033, 467 P.2d 344 (1970); *State ex rel. Carroll v. Simmons*, 61 Wn.2d 146, 377 P.2d 421 (1962). We have, therefore, looked to the entire record to determine if the

trial court's suppression order was a correct application of the law.

 The trial court held the officers lacked probable cause to believe their informant was credible or his information reliable because they did not inquire regarding his right to be present at the residence. We do not agree that, in order to satisfy the 2-pronged test of *Aguilar v. Texas*, 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964), a peace officer must in every case make such an inquiry as a prelude to a determination of probable cause either to apply for a warrant or proceed without a warrant under one of the recognized exceptions. Assuming there may be fact situations where such questions would have some relevance to the ultimate determination of probable cause, this is not one of them. Llorens had provided much reliable information in the near past and there was nothing in the record which should have aroused suspicion or prompted such an interrogation. There was no evidence Llorens was accustomed to resorting to breaking and entering or other unlawful tactics in order to secure evidence of criminal activity. We fail to see how this omission bears upon his reliability as an informant.

 Next, the trial court also concluded the evidence was tainted by Llorens' status as a trespasser or "presumptive burglar" and that its use was constitutionally proscribed. Such a conclusion must necessarily have derived from a finding first, that Llorens' activity was imputable to the state and second, from an application of the "fruit of the poisoned tree" rationale of *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963). Again we disagree. It is only improper governmental activity which triggers suppression of its fruits; there is no prohibition per se against the state's use of evidence or information obtained by private citizens through unlawful means. *Burdeau v. McDowell*, 256 U.S. 465, 65 L. Ed. 1048, 41 S. Ct. 574, 13 A.L.R. 1159 (1921). In order to impute the illegality of the private citizen to the state, the latter must have in some way instigated, encouraged, counseled, directed, or

controlled that conduct. *State v. Birdwell*, 6 Wn. App. 284, 492 P.2d 249 (1972); *State v. Wolfe*, 5 Wn. App. 153, 486 P.2d 1143 (1971). At the least there must be some showing of pre-knowledge and acquiescence from which a reasonable inference can be drawn that the state has encouraged or cooperated in having a private party do for it that which it is forbidden to do itself. *United States v. Mekjian*, 505 F.2d 1320 (5th Cir. 1975); *United States v. Clegg*, 509 F.2d 605 (5th Cir. 1975). In *Gundlach v. Janing*, 401 F. Supp. 1089 (D. Neb. 1975), it was held that mere knowledge by the government that a private citizen might conduct an illegal private search without the government taking any deterrent action was insufficient to turn the private search into a governmental one. The decisive factor is whether there is governmental participation in "the total enterprise of securing and selecting evidence by other than sanctioned means", *Lustig v. United States*, 338 U.S. 74, 79, 93 L. Ed. 1819, 69 S. Ct. 1372 (1948).

Nor do we think the added fact that Llorens had received money in the past for his services alters the result. A case closely in point is *United States v. Luciow*, 518 F.2d 298 (8th Cir. 1975), in which a search warrant was obtained for defendant's apartment based upon a paid informer's information obtained after she had been told to stay away and while she was trespassing therein. In upholding the trial court's refusal to suppress the evidence obtained, the United States Court of Appeals said at page 300:

> There is, however, no evidence in the record that agent Anderson or any other federal or state officer involved in the July 9, 1974, search directed, authorized or knew of any illegal entry by Stenseth on Luciow's property. Before her action can be attributed to the government, some degree of government instigation of the illegal entry must be shown.

Here there is no evidence that Llorens received any compensation or remuneration from the Clark County Sheriff's office to aid, abet, or encourage him to make an illegal entry to the premises in question or engage in any other unlawful activity in order to secure incriminating informa-

tion against defendants. Contrariwise, it is clear the officers acted upon the good faith impression that Llorens had permission to be on the premises; this was bolstered by his statements and their observations of his packing his personal belongings in his suitcase preparatory to leaving with them.

■ Lastly, the State urges the trial court erred in concluding:

Although time was short under these facts and circumstances, there was time to give an oral, telephonic, or recorded affidavit and obtain a search warrant, or at least to make an attempt to do so. No such warrant was obtained or attempt made, though the same was required by law.

Conclusion of law No. 4. We agree with the State because to so hold would require that law enforcement officers terminate a criminal investigation at the first point at which they have amassed sufficient evidence or information to provide probable cause of the commission of any crime, even though it may be only a single step in a larger scheme or plan to perpetrate a more serious offense or offenses. In the instant case, the officers, acting on the information from Llorens, had good reason to believe not only that defendants were in possession of LSD, but intended a delivery of that substance. The focus of law enforcement is, as it should be, on the apprehension of proven drug traffickers, without whom there could be no simple possessors. The plan here was for the officers to secrete themselves and observe an actual delivery before making an arrest, but this plan was frustrated when it became apparent Agee would recognize Llorens. At that point the officers had no choice but to effect an arrest for unlawful possession and search the defendants as an incident of that arrest.

Clearly, at the time of arrest the officers had substantial corroboration of collateral facts of criminal conduct to support the information Llorens had previously given. *State v. McGee,* 15 Wn. App. 563, 550 P.2d 552 (1976); *State v. White,* 10 Wn. App. 273, 518 P.2d 245 (1973); *cf. State v. Chatmon,* 9 Wn. App. 741, 515 P.2d 530 (1973). These addi-

tional facts were (1) defendants appeared at the residence at or about the appointed time, (2) Agee was one of those appearing, (3) defendant Chulufas asked for "Wayne," the alias used by Llorens, and (4) Agee's spontaneous statement to Officer Buller, "You got me good this time." The officers having then garnered additional substantial corroborative facts supporting probable cause to believe defendants were carrying LSD, it was not incumbent upon them to seek a warrant in light of the clearly emergent or exigent circumstances facing them. *State v. McGee, supra*; *State v. Smith*, 9 Wn. App. 309, 511 P.2d 1390 (1973); *Carroll v. United States*, 267 U.S. 132, 69 L. Ed. 543, 45 S. Ct. 280, 39 A.L.R. 790 (1924).

The orders suppressing evidence and dismissing the charges against the defendants are reversed and the cause remanded for trial.

PETRIE, C.J., and PEARSON, J., concur.

Petition for rehearing denied September 16, 1976.

Review granted by Supreme Court January 24, 1977.